Thank you so much, and thank you for your patience, counsel, as we conducted some other business this morning. We have the next case to be heard is Ng v. Attorney General, Appellate Number 20-1340. We'll hear from Petitioner first. Go ahead, counsel. Thank you very much, Your Honors. My name is Christopher Cazzazza. I represent the petitioner. May it please the court, my name is Christopher Cazzazza. I represent the petitioner in this time. That'll be granted. Thank you. Thank you. This case is not about changed country conditions in Indonesia. This honorable court is bound to review the BIA record based solely on the four corners of its decision. As a specific matter, it is about the BIA's failure to announce its decision in terms sufficient to enable this honorable court to review how it came to its abrupt and unexplained departure from its own contemporaneous decisions on nearly identical cases. And on a more macro level, this is about the BIA's chronic history of failing to meaningfully review the record and provide detailed decisions. Can I just jump in there? Because the way that you articulated what this case is about is a little different than the last sentence of your blue brief. Your blue brief said petitioner respectfully requests that this honorable court vacate the order of the BIA and remand this order with instructions to grant Eng's motion. You no longer want that, at least as you articulate it now, you're no longer asking for the instructions. You're asking for a remand, but not with instructions to grant the motion. I think it's extraordinary measure for the third circuit to instruct the or any circuit court to instruct the board to act in a certain way other than to review the record. So perhaps requesting a grant was a bit of an overreach on my part and perhaps wishful thinking. But the fact of the matter is I would request that this court remand with instruction to properly review the record and properly articulate as to why evidence in favor of the petitioner was not sufficient to establish a change in country conditions. I would also ask this court remand to for the board to explain in a cogent explanation as to why they have granted to my account 19 motions to reopen based on Chinese Christians in the past year and failed to approve this motion. It's an inexplicable. Are there any others that have not been approved? You counted the 19 that were approved. What about mine? To my knowledge, I have not discovered any unpublished decisions of denials in this case. I have been researching unpublished decisions on this matter for the past year. I have not found any that have been denied with the exception of this one. Let's talk about the fact that there's two components to this sort of request. One is a changed country condition. The other is prima facie showing of eligibility to what I understand from your brief in this case would be asylum. That's correct. Okay. So the standard for asylum is reasonable likelihood of persecution. That's correct. Okay. Don't you have putting let's assume there's been a changed country condition. What is your evidence to show there's a really reasonable likelihood that this particular individual faces a specific threat of persecution? Well, your honor, it would, it would, frankly, it would be there'd be two theories here. The first would be that his prior experiences as a Chinese Christian in Indonesia, including a robbery that he believes was incited by the fact that he is a Chinese Christian resulted in a serious injury. And the second being that he was a second robbery that he was robbed at gunpoint with his mother. But our court has already concluded that they weren't connected to this protected ground. So going forward, what else do you have besides that we're we're sort of kind of have a law of the case kind of issue? Understood, your honor, it would be a pattern and practice of persecution of Chinese Christians within, within Indonesia, which would this court would have to, which would require we showing at a trial on asylum that there's a systematic, pervasive and organized or organized persecution of Chinese Christians in Indonesia. So your position would be that the BIA's error was infected your error, as described as a failure to fully engage with the record and explain why certain evidence did not support your client's infected the prima facie analysis. That's correct, your honor, this court has found in and I believe it's goes without saying almost that the the question of whether or not it's reviewed the evidence, whether or not it has articulated why evidence in favor of the petitioner was rejected or turned away is a threshold matter. You don't I don't believe we get to the prima facie eligibility without first reviewing the record as to whether or not there are changed circumstances in Indonesia. But given that the BIA's decision is largely devoid of any anything but conclusory statements that this is ongoing, I don't believe that we can then do an analysis as to whether or not he has met his prima facie duty or prima facie burden of showing whether or not at a trial he could prove a pattern and practice of persecution. The BIA in its decision says that it considered a host of exhibits going from tab D to triple B, which is 50 plus exhibits. Why isn't that enough? Well, your honor, it's true that the petitioner has a heavy burden to warrant reopening, but this court has found that there is a heightened duty to explicitly consider any country condition evidence submitted by the applicant that materially bears on a change in country conditions. And if there is evidence within the record that supports the petitioner's claim that there is a change in country condition, this court has found that the BIA must explicitly explain why that evidence does not push the petitioner beyond their burden. There's no discussion of the evidence within the record. And I'll bring up Liam, which was decided in April of 2019. I'm not suggesting that Liam, that my client is similarly situated to Liam in their background. What I am suggesting is that they, the BIA cited only seven of its 30 some exhibits, and in doing so, they failed to address many of the same pieces of evidence that I have submitted in the petitioner's brief. Why did the evidence, which shows a rising, increasing, growing, gaining, worsening conditions in Indonesia for Christians, why did that evidence not meet the BIA's burden? Well, I mean, at one level, I mean, this is what we know. We know that petitions to reopen, you know, I don't know the exact formulation by the Supreme Court, but they're rare. Maybe it's their disfavor, they're unusual. There's something heightened about petitions for reopening. And forgive me, I'm missing the legal catchphrase that associates with these. And so now the question becomes, you're looking at our precedent, and you're saying, well, what degree of what I'll call show your work is needed by the BIA? Now, if the BIA says, you know, we've looked at everything, and this is our answer, that's better than saying this is our answer. But it's not as good as saying an itemized look of all 54 exhibits and how they move the dial. And so then we run into this shenari problem, which is respondent kind of takes and maybe fills in a little of the show your work requirement that you say the BIA didn't do. But shenari doesn't say we can only affirm based on express reasons that an agency did. shenari seems to suggest that, look, you know, we're limited to the rationale generally. And the rationale generally was change of country conditions. Country conditions haven't changed enough under the kind of rare extreme, I'm botching the modifier, petition to reopen. So I guess the question I really have is, what's the standard for show your work? And even with shenari, why doesn't respondents brief kind of complete that picture in a way that is sufficient? Your Honor, I will address that. There's a lot there. You can unpack it however you want. Okay, thank you very much, Your Honor. First, I'll note that in Liam, they stated that even if the BIA reached the correct conclusion, its failure to explain why the evidence did not show materially changed conditions constitutes an abuse of discretion. What the BIA is bound to do and what they must do before the court is at least provide a decision that's reviewable. The government's brief parses out the record and attempts to show evidence that but the government respectfully is not the BIA. We cannot make assumptions about what the BIA did. They simply state, yeah, we reviewed everything, but it didn't cut the mustard, if I can speak colloquially. Well, there's a heightened burden based, this court has said that in these types of motions to reopen, there is a heightened burden for them to review the record and explain why evidence in favor of the petitioner does not support their claim. Here, there's no such analysis by the BIA. Well, so let me just tease this out. Let's just say that this gets remanded to the BIA. The BIA says, okay, we need to do more. And then they cut and paste wholesale from Red Brief. I mean, I guess I'm questioning how much show your work is needed. Are you saying that more the BIA would have to do even more than Red Brief? Or if they just cut and pasted from Red Brief, do they meet that standard in Zang or Go or whatever case you want to pick? Well, I would say no, your honor, because while that brief, while the government's brief explains evidence against the petitioner, it does not explain the volumes of evidence in favor of petitioner and why they have dismissed that evidence, which is a requirement of their analysis. So there's certainly, if you dig through the record, there is certainly evidence supporting both standards. But the BIA, it's an appellate court that has a duty to uphold due process. And they can't simply issue blanket statements and decisions, which essentially amount to a too bad, I'm sorry. And they certainly can't do that when contemporaneously they've approved 19 such motions. And in doing so, in departing from their contemporaneous decisions, they must provide some cogent reason as to why they've done that. And they haven't done so in this case. And I've provided 17 decisions because I submitted my brief in July. There are two such decisions that have come since then that I've become aware of. And in some of those decisions are two sentences long. Some of those, including Sukhwan Putra, which this case is a precedential decision involving two Catholic petitioners, they simply say there are, it's two sentences and they simply say there are changed country conditions in Indonesia that support their claim. That's the entirety of their decision. Here's a question I have for you. The BIA essentially says, look, he was here in 2004. He's back here in 2019. He's provided reports from 2015 through 2019. But we compare that to what was produced in 2004. And it's really a continuation of the same kind of alleged persecution of Chinese Christians in Indonesia. Nothing has changed. This is not a situation, and plus they did it, the BIA did indicate it. It looked at the exhibits. I mean, what more do they, how much more detail do they have to get into on a comparative basis to meet the standard that you're asking for at this procedural change and ask in not accepting the new reports as changed conditions? Your Honor, I'm glad you asked that question. To this point, importantly, the board must evaluate motions to reopen in their totality based on the specific country. In Indonesia, Indonesia undoubtedly has a long history that spans decades, if not longer, of ongoing discrimination and violence towards Chinese Christians. At some points in their history, that rises to persecution. At some points, it does not. So when you review a motion for changed country conditions based on change, excuse me, when you review a motion to reopen based on changed country conditions in the context of Indonesia, it's a nuanced and detailed factual inquiry. You're looking for evidence that shows that it has gone from discriminatory to now persecution, which is a much smaller jump than, say, in a typical motion to reopen based on a change in a political party or a genocide or a civil war. So can I just ask you a question? Because the first few pages of your reply brief touch on this theme a lot. And I guess my thought in that respect is, I'll put this really simply, it was really bad in 04 or in the late 90s, leading to kind of 04 decision. The conditions in Indonesia got, I guess, less bad for about 15 years. And then there's an uptick. And now they're really bad again. But it is very, very, very colloquially how I understand your position. So at one level, though, changed country conditions in a motion to reopen context, you're looking at the original proceeding. So if the original proceeding was 2013, when things were not so bad, you have a pretty good case that it's worse now than 2013. But your reply brief indicates it was really, really bad in 04. So at one level, I mean, I guess, isn't the BIA only trying to say our comparison isn't changed country conditions based on last year or the intervening 15 years of good? It's at the time of the proceeding. And what we've is that we don't see anything that's only shows that it's gotten worse a few years. That's not evidence that shows that it's worse than 2004. And so why can't they just summarily say, we've looked at all your evidence. Your evidence comes from the last few years. Now there's a massive uptick in the last few years. Congratulations. That's good evidence. Had the hearing been in the last few years, but your original hearing was already during a bad period. So why doesn't that lead to kind of a more summary? Why doesn't the BIA get the opportunity to give more summary analysis when they said, well, look at your evidence, we don't have anything that shows a difference from 2004? Your Honor, I don't know. And respectfully, I don't know that my brief says that things were bad in 04. I believe it says that there was a large uptick in 1998, which led to the dysphoria and a lot of the cases being granted. But I believe it was around 2004 that this court in Lee found that there was not a pattern in practice and that things were actually getting better in 2004. The report evidence that was submitted in the record shows that there has been improvements in the human rights and in the religious harmony of Indonesia. 2004, I believe was several years, a few years into the betterment of the conditions, the conditions becoming less worse. I think when you compare the country conditions to now, especially in the past 2016 to present, they are continually getting worse. And they're doing so, as I was making my point earlier, they're doing so in maybe not a way, when you look at it, you say, oh my goodness, there's a civil war going on now. They're doing so in a nuanced way, but nonetheless, a very, very serious way. So I guess my question is though, how much attention does the, let's say that some of your exhibits say things are dramatically worse now than they were in 2016. How much attention does the BIA have to give that piece of evidence when we're looking at a changed condition from the status as in 2004? Well, your honor, it all has to be compared back to 2004. So I think the BIA has a duty to review the record meaningfully and to write a decision that reflects how they came to their conclusions without providing a simple conclusory statement. Again, in the cases that are on point here and the cases having to do with remand for failure to meaningfully review the record and articulate the decisions, they are cases where this court finds that the BIA did in fact review five, six, seven pieces of evidence, but left out many, many other pieces of evidence in their decision. In this case, they really, they cite to no cases. They make a general conclusory statement. We reviewed everything and we're sorry about that. It doesn't meet the standard. And they do that while contemporaneously approving many other cases, including the same board member who made this decision has since approved cases. Thank you, counsel. Let me just ask judge Fisher if he has any further questions for you on this, on your opening argument. Not at this time. Okay. Judge Phipps, any further questions for counsel? We'll have you back on rebuttal. Mr. Hardy. Thank you, your honors. I may have pleased the court. Joseph Hardy for the attorney general. Good morning, counsel. Sorry. As was discussed earlier, the board reasonably denied petitioner's motion for two reasons. I'm going to take the reverse order. Actually, it was the order that judge Schwartz, you kind of took counsel to anyway. The first issue being that he has failed to establish a prima facie eligibility for relief. And independently, he failed to establish materially changed country conditions in Indonesia since 2004. Judge Schwartz, if I may, you kind of took counsel there. It was a question in talking about prima facie eligibility. We talked about the merits of the case. As we point out in the brief, petitioner has waived any challenge to merits of the no prima facie eligibility finding. In this case, he's only made an argument as it relates to the standard that the board applied and finding that he hadn't established prima facie eligibility. And petitioner didn't discuss that in his opening. He only talked about the merits. But again, that issue is not before the court. As far as prima facie eligibility goes, the only argument that petitioner raised in his opening brief is that he believes the board improperly required him to conclusively show that he did not meet the requirements for asylum and related relief. But as we point out in the brief, and I don't want to rehash too much, but if you look at the first page of the board's decision, it specifically notes with respect to prima facie eligibility, that petitioner was only required to show that he was likely or that the evidence that he submitted was likely to change the results in his case. And the board specifically cited to this court's decision in Plumey and to its own precedential decisions and matter of CWL and SYG, all of which note the standard for prima facie eligibility. And then the court, and then the argued that there was a pattern or practice of religious persecution in the case, it found that, no, you didn't establish that. What we see is that there's simply, as Judge Fisher, you know, that just ongoing religious intolerance in the country, not ongoing religious or pattern, how do you say, pattern and practice of persecution in the country. How do you reconcile though this BIA decision with the more than 15 BIA rulings looking at very similar evidence and reaching a totally opposite conclusion? So two things, Judge. First, as far as the six decisions that petitioner attached to the reply brief, I don't know what the other 13 decisions are that he references. As far as the six, none of them reference prima facie eligibility. They're all material change country conditions cases. So, and that's what I was, my fault for not being clear. That's what I was talking about. I was trying to link back to your conclusion, your statement that this BIA decision says it's a continuation of ongoing problems. And my question to you is how does that square with the BIA rulings attached here, the BIA rulings attached to the record in Liam? That's how we get to a pretty high number of BIA officials reaching an opposite conclusion based on the same evidence. And I'm asking if you can square them. Okay, certainly. So Judge Fisher, one question that you had for council before was whether there were any cases that held to the opposite or similar to what the board has done in this case. And I don't want to do the whole name dropping thing, but I believe Judge Schwartz and Judge Phipps, you know well, the Kwong-Na case that I cited in our answering brief, that was your case that was decided back in, I believe, April of this year. It also involved a Chinese Christian and the board in that case, just as in this one, found that petitioner simply hadn't established material change based on the evidence that that particular petitioner presented in his case. Right, and he had a different timeframe. He was 2016-ish. It was much- And that goes to, I believe, Judge Phipps' point earlier where there was that different timeframe from 2016 where, yes, conditions around that time in the country were, we'll say, Judge Phipps was less bad than they were back in 2014, but as compared to the time that petitioner had filed this motion. But the, if anything, that, I would believe, helps our point that conditions at the time, there was a point where I believe the president in Indonesia back in 98 or who ended at the time was Suwarto, was somewhat of a dictatorial president at the time. And then there was that period from like, as the Seventh Circuit points out in the Meriu decision that we cite in the timeframe for petitioner's prior hearing where conditions were particularly bad in the country. And then there was a time period, I know this court had a decision in 2008, a Wong decision, W-O-N-G, where it found that conditions had in fact improved mainly during the later half of that decade and going into the next, into the 2010s. And so what you look at when you look at Liam, a lot of these decisions cite Liam. I mean, what I'm saying, I don't know necessarily about these board decisions, but this board cites Liam, you have the Seventh Circuit cites Liam, and I believe the Second Circuit had a decision earlier this year also. What Liam, I believe, doesn't do is petitioner's brief suggests that the court is saying almost as a matter of law, that conditions had changed. And then he points to the 19 where, oh, look, where the board found all these cases where conditions had changed. The Liam court never finds that conditions had changed since that petitioner's merits hearing at the time was 2003. As Judge Phipps said, that was a particularly bad time in the country's history. What the Liam court does is looks at the 26 exhibits that petitioner cited. And just as petitioner does on page 14 of his brief, it growing. And it says that these potentially could meet his burden of establishing material change. Mind you, Liam never found a change in conditions. As was stated earlier, it sent it back to the board for the board to make that determination in the first instance. Liam, if you look at- But some of the Liam exhibits are the same as this record. So why don't we do the same thing? Because- And send it back for them to, as Judge Phipps said earlier, show their work. If it's not persuasive, tell us why. We've had another panel who said there's enough here that warrants some explanation. And so what you have here is in the Liam court, as petitioner pointed out, the panel said that, well, on the one hand, the board only cited seven of the 26 or 35 exhibits, I believe, that petitioner cited. Here, Judge Schwartz, as you mentioned, the board specifically cited all of his exhibits, tabs BBB through, I believe, BBB, right? And then the board specifically cites to Liam for the proposition that it was required to meaningfully consider all of his exhibits. But as Judge Phipps said, it's not necessarily required to go through and tabulate all, I believe, 51 country conditions exhibits that petitioner submitted in this case. And then you have also where, just to know that the board has specifically considered petitioner's motion, petitioner cited this court's decision in Liam, and he cited the First Circuit's decision in Seeleton. And it specifically analyzed his arguments and discussed why his case was factually dissimilar from those cases. So you clearly see, unlike the decision, and I did look at the board's decision in Liam, you have a lot more in this case that specifically suggests that the board did, in fact, consider all of his evidence. And you have to give the board a presumption of regularity that it did what it was supposed to, particularly in this case, where it specifically cited to the Liam decision for the proposition that it was required to consider all of his evidence. And as Judge, I believe, Fisher mentioned earlier, why does the board need to go through, I mean, from what I gather from petitioner's arguments is he expects that the board is going to do like this court did in Liam, and list all 51 country conditions documents that he submitted in an effort to say, okay, well, we think that this, you know, compare and contrast everything, but I'm not, in my brief, I go through just as the Seventh Circuit does in the Merriweather decision, I look at the evidence that petitioner himself submitted, including the 2003 country report, the 2004 country report, DHS, I believe, submitted the 04 and the 05 country reports. And I do what the courts have said the board is required to do, and what the board did do in this case, it looked at the evidence at the time, it knows from prior decisions that at that time, from the late 90s to the early 2000s, that it was a particularly bad time in the country. And then it looks at the conditions now and says, yes, conditions are still bad. So perhaps if the conditions were perhaps on a 10 back at the time, and as Judge Phipps mentioned, conditions got less bad, maybe they dropped to a five. And it just seems particularly, if you look at some of the to the president who's there now, but the evidence that this petitioner submitted and Liam submitted seemed to suggest that there's been a rise in or a worsening of conditions in the country, simply since President Joko Widodo took office in late October, 2014. For some reason, that seems to be the timeframe that they want to begin to submit this new evidence from about 2015 to, in this case, 2019. Mr. Hardy, let me throw this in. There's a 15 year gap between the initial order and then the petition here to reopen. And for who knows why that gap exists, and we won't get into that. Yes, sir. Should there be some sliding scale of sorts, the greater period of time that elapsed, the more the BIA needs to specifically comment on the additional evidence, or should perhaps be the for us to go through each and every submission? Because maybe there's some waiver, maybe there's some latches here that comes in play. And I'm trying to look at this from the position that the BIA could find themselves in moving forward with this, not just Indonesia cases, but other cases where people have been around, you know, that magical 12 million that everybody cites, who knows what that number is anymore. But it seems like a lot of people could fit in this category. And we need to be careful what we say here, because the workload for the BIA could be increased significantly if we say the wrong thing. Well, I mean, I can tell you from personal experience, the workload of the BIA has greatly increased in times. And I think that's looking at the decision, the board is saying that, especially as you're aware, I think many of these Indonesian cases, and I don't mean to be flippant, but they're coming back around in recent years, as many of these people are being picked up. And as you mentioned, there was a 14-year gap between 2004, could even say when the court issued its earlier decision later. I mean, there's no indication here in the record that anything happened, but rather, you know, and just showed up with this petition. No one seemed to be bothering him, he showed up for this petition to reopen. Maybe that goes to his credit. He voluntarily came in and tagged up. No, he didn't, Your Honor. What happened was he was picked up by DHS, and then he filed a motion. And that's how this came back to the board. Okay, I didn't see that in the record. He was picked up. But they, and I may be wrong, and I see counsel gesticulate. I mean, he can correct me if I'm wrong. But these cases came up when, a lot of these people were being picked up by DHS in recent years. And that's why I believe there was a district court case in the district of Massachusetts, I believe, where there were a number of cases where people, a habeas case, where a number of the people were being picked up, and then they filed a number of motions. They were allowed to file motions, basically, claiming changed country conditions. And I think that's where you get this more recent timeframe. I can imagine that if there were people who had filed motions back in the 2015, 2014, or earlier timeframe, things like that, you may have a seen a point where, as Judge Phipps pointed out, where, yes, conditions versus that timeframe versus now, you would have seen a big difference. But the conditions are basically at most back to where they were back in the early 2000s. And that's petitioners problem in this case. Yes, in the Liam Court, as I started to point out earlier, the Liam Court looks in and it sees all these words like worsening and increasing. But the question is, worsening and increasing since when? And if you notice, the court never goes back. And I do see that my time is, my own timekeeping is at about 15 minutes, if I may finish. Thank you. And so I do see that if you look at the Liam Court's opinion, they never go back and say worsening since 2003, which was the time period of the marriage hearing. In that case, they just say worsening. And so because they only looked at the 2015 to 2018 timeframe of the evidence that that petitioner presented. But the court understood in Liam what was the operative timeframe. And 2003 was the operative timeframe and they were doing its comparison. So I think they were appropriately cabined in terms of that frame. If I could ask Judge Phipps has any further questions of counsel? No, thank you. Judge Fisher? No, thank you. Mr. Hardy, thank you for your arguments. And we'll hear counsel on rebuttal. Thank you. Thank you very much, Your Honor. Respectfully, I'd like to correct Mr. Hardy. I don't think that he miss misspoke on purpose. The petitioner in this case was never picked up by immigration or ICE. He simply filed this motion to reopen out of his own genuine fear. There was nothing that forced his hand in doing so. The government makes the argument that a lot of these have come because there has been a increase in the enforcement of immigration policy laws against Indonesians who were previously ordered removed. That may be so, but it coincides with the fact that the BIA is granting these motions to reopen. These motions to reopen, which the BIA says and this court acknowledges are highly disfavored. And they're granting them because they have found a change in country conditions. They are not cited. I mean, I do not want to even begin to pretend to know each one of those BIA decisions at a level that you or your opposing counsel do. But are all of those comparing apples to apples in the 2019 to 2004? Or are some of those comparing 2019 to 2013? In my review of them, they are all from the early 2000s. There's not one of them. I think there may be one that it goes as far as maybe 2009, I believe. And they're in the record and they do state the time frame in those decisions. But none of them reach the same conclusion with cases where their last individual hearing was in 2012, 13, or beyond. So the fact of the matter is this decision is inexplicably arbitrary. And this court has found, it found both in Shardar and it found both in Cruz that when the BIA departs from contemporaneous decisions, they must provide a cogent reason as to why they are departing from those decisions. There's nothing in this record that substantially differs from any of those cases. And so I think that this court can find that the decision is arbitrary on those grounds. And that's a threshold matter. So if you get to the fact that it's arbitrary because it departs without explanation, I don't even think we get to the question of change country conditions. I don't think we get to the question of prima facie eligibility and we don't get to the question of properly reviewing the record. Do you agree with your adversary that you've waived the prima facie challenge or do you think that that sentence that he read to us was sufficient to preserve? I do believe that I preserved the prima facie challenge. I find that if the BIA has made a legal error in making a prima facie determination then certainly, and I've brought up that legal error, then certainly I'm challenging their decisions. If I challenge the foundation of their decision, then I don't have to specifically attack the more nuanced findings of that decision. Okay, let me ask Judge Phipps, do you have any further questions of counsel? No, thank you. Judge Fischer? I have none. Okay, your rebuttal time has expired. But I thank on behalf of the panel, we thank both counsels for a very helpful argument and being with us under these unusual times and we wish you guys to be safe and your families to be healthy and your friends as well. We'll take them back under advisement.